IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Tessie Theressa Casey, ) | |
| ) | Civil Action No. 8:11-1432-HMH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Plastic Omnium Auto Exterior, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 101). In her amended complaint, the *pro se* plaintiff alleges that her former employer, defendant Plastic Omnium Auto Exterior, LLC, discriminated against her because of her disability in violation of the Americans with Disabilities Act ("ADA").

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

On June 1, 2012, the defendant filed a motion for summary judgment. On June 4, 2012, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the motion for summary judgment procedure and the possible consequences if she failed to adequately respond to the motion. The plaintiff filed her response on August 7, 2012. The response was also styled as a motion to strike the motion for summary judgment and was docketed as such by the Clerk of Court. The defendant filed opposition to the motion to strike and in reply to the plaintiff's response in opposition to the motion for summary judgment on August 17, 2012. The plaintiff filed a second response in opposition to the motion for summary judgment on September 5, 2012, to which the defendant filed a reply on September 12, 2012.

**FACTS PRESENTED**

The plaintiff began her employment with the defendant on December 6, 1999 (pl. dep. 20). During her time with the defendant, she worked in several departments and in several different capacities, including the Assembly Department and Service Department.

On July 20, 2007, the plaintiff left work to visit her doctor (*id.* 37). Approximately two weeks after that doctor's visit, on August 3, 2007, she was admitted into the hospital and diagnosed with lupus (*id.* 36-43). According to the plaintiff, the symptoms of her lupus are "[s]welling, aches and pains" and "sore joints and stuff like that" (*id.* 34-35). She remained out of work on Family and Medical Leave Act ("FMLA") leave from July 20, 2007, until October 1, 2007, when she returned to work with certain physical restrictions (*id.* 44-46, 49-52). The defendant allowed the plaintiff to return to work and accommodated the restrictions imposed by the plaintiff's doctors (*id.* 49-52).

The defendant's Human Resources Manager, Karen Beasley, was familiar with the plaintiff's condition, as Ms. Beasley also has lupus (Karen Beasley aff. ¶ 3). According to the plaintiff, on February 1, 2008, Ms. Beasley told her that her department would be going from a 40-hour per week schedule to a 50-hour per week schedule consisting of five ten-hour days (amended comp. ¶ 6; pl. dep. 87-88). Four days later, on February 5, 2008, Dr. Muthamma Machimada issued a note stating that the plaintiff could work eight-hour shifts with no other restrictions (pl. dep. 54-55). The defendant complied with the plaintiff's doctor's wishes, allowing the plaintiff to work only eight-hour shifts (*id.* 58). The plaintiff alleges that in light of her doctor's orders, Ms. Beasley told the plaintiff that she would not be required to work ten-hour days like the other employees in her department, but that the plaintiff would have to use vacation time for the hours that she was unable to work (*id.* 54-55). The defendant's FMLA policy provides that "[a]ny leave of absence will require an Associate to utilize any annual vacation benefits available" (Patrick Raley aff. ¶ 3, ex. A).

The defendant's time records show that the plaintiff took 12 hours of paid vacation time in addition to 32 hours of working time (totaling 44 hours) for the week of February 11 – 17, 2008, and she took eight hours of paid vacation time in addition to 39.33 hours of working time (totaling 47.33 hours) for the week of February 18 – 24, 2008 (*id.* ¶¶ 4-5, ex. B, C). The plaintiff took a total of 36 hours of vacation time between January 28 and March 3, 2008 (*id.* ¶ 6).

On February 6, 2008, the plaintiff requested that Ms. Beasley move her into a department that only worked 40 hours per week, even suggesting the defendant's Service Department (amended comp. ¶ 7; pl. dep. 93). Ms. Beasley moved her into the Service Department shortly thereafter (pl. dep. 108). The plaintiff claims she cannot remember the date when she was moved into the Service Department, but believes it to be some time between February and May 2008 (*id.*). The defendant's pay records indicate that the plaintiff was moved into the Service Department in late February, less than three weeks after her request (Raley aff. ¶ 7). By the week of February 25-March 2, 2008, the plaintiff was working 40 hours and using no vacation leave (*id.*, ex. D). She did not use any more vacation leave until the week of March 24-30, 2008 (time that was requested by the plaintiff herself) (*id.*, ex. E).

When she was transferred to the Service Department in late February 2008, the plaintiff was supervised by Rick Wallace, until Mr. Wallace left the company on August 16, 2008 (*id.* ¶ 8). The plaintiff remained in the Service Department for the remainder of her time with the defendant (*see generally* David Hunter aff., noting that the plaintiff was employed in the Service Department at the time of her layoff).

On April 28, 2008, the plaintiff's doctor, Amir Agha, issued an "excuse slip" stating that the plaintiff could not work more than 40 hours per week until her next appointment (pl. dep. 61). The defendant accommodated this restriction and did not ask the plaintiff to work more than 40 hours per week (*id.*).

3

On May 8, 2008, another of the plaintiff's doctors, Dr. Jack Cole, ordered that the plaintiff stay out of work until she had been reevaluated by her rheumatologist and neurologist, from May 7, 2008, through May 15, 2008, "at least" (*id.* 62-64). The defendant complied with Dr. Cole's orders and allowed the plaintiff to take leave for those dates (*id.*).

The plaintiff contends that on or around August 4, 2008, Karen Beasley laid her off because the Service Department was moving to a ten hour shift and the company "could no longer compensate [her]" (amended comp. ¶ 13; pl. dep. 66-67). The defendant does not have a record of the plaintiff being laid off at this time (Raley aff. ¶ 9).[1] However, the defendant's pay records indicate that the plaintiff was only scheduled to work a few hours during one week in August 2008. Specifically, the plaintiff's earnings statement for the week of August 4, 2008, through August 10, 2008, shows that the plaintiff only worked three hours that week (*id.*, ex. F). However, her earnings statement for the following pay period (August 11, 2008, through August 17, 2008) shows that she was back at work, working 32.5 hours that week (*id.*, ex. G). This is consistent with the plaintiff's recollection that she was recalled to work by Ms. Beasley "a couple of days" or "in a week span" after her alleged August 2008 layoff (pl. dep. 68). The plaintiff suffered no break in service or break in benefits during August 2008 (Raley aff. ¶ 9).

On August 28, 2008, the plaintiff's doctor issued a note indicating that she was able to work with no restrictions (pl. dep. 65-67, ex. 10). The plaintiff continued to work with no restrictions during the remainder of her time with the defendant.

Around December 2008, the defendant's largest customer, BMW, made the decision to change the work schedule at its facility in Greer, South Carolina, from what is known as a "5.5 shift" schedule to what is known as a "5x8" schedule (Hunter aff. ¶ 3). The

---

[1] Karen Beasley has no recollection of a reduction in force that would have affected the plaintiff (Beasley aff. ¶ 5). However, Ms. Beasley does recall that from time to time during the plaintiff's employment with the defendant it was necessary for the company to refrain from scheduling some employees for work during certain weeks due to lack of work (*id.*).

4

defendant anticipated that this change would result in a reduction in the number of hours during which work would be performed at BMW's facility, as well as a corresponding reduction in production at that facility (*id.*). Anticipating that a reduction in the demand for its parts would result from BMW's reduced production, the defendant also decided to change from a 5.5 shift schedule to a 5x8 schedule for night-shift employees and from a 5x10 schedule to a 5x8 schedule for day-shift employees[2] (*id.*). Prior to this change, all the defendant's production employees were part of three teams, two of which would be working at the facility at any given time (*id.* ¶ 5). After the change, the company made the decision to cut its workforce down to two teams of employees working a 5x8 schedule (*id.*).

Also around December of 2008, the company made the decision to transfer a large portion of its Service Department work to a facility in Norcross, Georgia (*id.* ¶ 6). As a result of the new schedule, the reduced production requirements, and the transfer of a significant portion of Service Department work to the Norcross facility, the defendant implemented a reduction-in-force at its Duncan facility (*id.*). Pursuant to that reduction-in-force, between December 17 and 20, 2008, the defendant laid off 16 full-time employees, including the plaintiff, as well as 34 temporary employees[3] (Raley aff. ¶ 10).

The Service Department, where the plaintiff worked, was reduced from 13 employees to eight employees (Hunter aff. ¶ 6). David Hunter, a Production Superintendent for the defendant, attests in his affidavit that he and Ms. Beasley selected the employees to be retained in the Service Department based principally on those employees' skill sets and adaptability to multiple positions, including in Service, Logistics,

---

[2] In a "5.5 shift" schedule, the facility is up and running five days and six nights per week. In a "5x10" schedule, the facility is up and running for five ten-hour days and/or nights per week. In a "5x8" schedule, the facility is up and running for five eight-hour days and/or nights per week (Hunter aff. ¶ 4).

[3] Before the December reduction-in-force, the defendant employed 239 employees at its Duncan facility. By February 15, 2008, the defendant employed only 176 employees at that facility (Raley aff. ¶ 11).

and Production (*id.* ¶ 7). Because the company would be laying off employees in Production, it needed to retain Service employees who were also trained to perform Production and/or Logistics tasks, so those employees could fill in for absent Production and/or Logistics employees if needed (*id.*). The defendant determined that it needed to retain four employees in the Service Department to work the day shift (*id.*). The four employees who were retained were all skilled and cross-trained in multiple processes within the facility (*id.* ¶¶ 8-13). The remaining day-shift Service Department employees, including the plaintiff, were laid off (*id.* ¶ 13). The plaintiff acknowledged in her deposition that she was not trained on a number of other job duties similar to the employees that remained in the Service Department after the layoff (pl. dep. 29, 160).

The plaintiff alleges in her complaint that Ms. Beasley told her she was being discharged because of her attendance (amended comp. ¶ 16), which Ms. Beasley denies (Beasley aff. ¶ 6). After her employment with the defendant ended, the plaintiff had 24 hours of accrued vacation leave, which the defendant paid to her (pl. dep. 179; Raley aff. ¶ 12). When she was told her employment with the defendant was ending, the plaintiff received from the defendant a severance agreement and release to be signed by her in exchange for the payment of nine weeks severance pay (def. m.s.j., ex. E, Requests to Admit ¶ 8).[4] The plaintiff contends that she never signed the severance agreement, and

---

[4]The defendant served the plaintiff with Requests to Admit on October 28, 2011, to which the plaintiff did not timely respond (def. m.s.j. 9, ex. E, Requests to Admit). Accordingly, the matters contained within those requests are deemed admitted. *See* Fed. R. Civ. P. 36(a)(3) (providing that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney"). Attached to her response in opposition to the motion for summary judgment, the plaintiff submitted a document entitled "Plaintiff first set of requests to admit to defendant," which is dated August 7, 2012, the same date as her response in opposition to the motion for summary judgment (doc. 121 at pp. 3-5). This response is clearly untimely.

The defendant argues that because the plaintiff failed to timely respond to the Requests to Admit and she has therefore admitted that she received and retained severance payments, she has ratified the severance agreement under which she agreed to release the claims she now asserts against the defendant. Because this court finds that summary judgment is appropriate on other grounds as set forth below, the release of claims argument will not be further addressed.

the defendant has submitted no evidence showing that the plaintiff did sign the agreement. The plaintiff admitted in her deposition that she received and retained nine separate payments in the total amount of $5,868.00 (*id.* ¶ 9; pl. dep. 202-208). Although she received notification in the mail each time a deposit was made into her account, she did not attempt to contact the defendant to ask why she was receiving payments after her employment ended (pl. dep. 202-208). The plaintiff testified in her deposition that she thought the payments were made to her "because of how bad they was treating me" (*id.* 202). However, she admitted that nobody with the defendant told her she was receiving payments for that reason (*id.* 203-208).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific,

material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the the the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

### *Administrative Charge*

The plaintiff filed an EEOC charge of discrimination against the defendant on February 13, 2009, alleging discrimination based upon her race (black) and her alleged disability (pl. dep., ex. 16).  The charge stated that the defendant "deducted two hours of my vacation time whenever I was approved for FMLA Leave, while similarly situated White employees had no vacation time deducted when on FMLA Leave" (*id*.). The charge also alleged that "[d]uring August 2008, I was laid off due to a medical restriction recommended by my physician" and that "I was later recalled to work, only to be discharged during December 2008" (*id*.). There are three allegedly discriminatory acts alleged in this charge: (1) requiring the plaintiff to use vacation time concurrently with FMLA leave, which the plaintiff apparently attributes to her race; (2) the layoff in August 2008; and (3) the layoff in December 2008 (*id.*).

In her amended complaint, the plaintiff made allegations regarding the defendant's failure to promote her in 2007 (amended comp. ¶¶ 4-5) and her alleged treatment by supervisor Rick Wallace (*id.* ¶¶ 8-12).  As noted above, the plaintiff's charge alleged disparate treatment only and did not state any claim for harassment, hostile work environment, or failure to promote. "The allegations contained in the administrative charge

of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (citation omitted). Only those allegations of discrimination contained in the initial charge, those reasonably related to the charge, and those developed by reasonable investigation of the charge may be maintained in a subsequent civil action. *Id.* at 963. Federal courts do not have subject matter jurisdiction over discrimination claims that are not raised in a charge of discrimination. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (citation omitted).  Based upon the foregoing, the plaintiff failed to exhaust her administrative remedies as to the failure to promote and harassment claims contained in her amended complaint, and thus those claims should be dismissed.  *See In Wells v. BAE Systems Norfolk Ship Repair,* 483 F.Supp.2d 497, 511 (E.D. Va 2007) (dismissing ADA hostile work environment claim because the plaintiff did not make such an allegation in her EEOC charge).

The ADA, like Title VII, requires a plaintiff in deferral states like South Carolina to file an administrative charge of discrimination within 300 days of any alleged discriminatory act. 42 U.S.C. 2000e-5(e)(1).  The plaintiff's charge was filed on February 13, 2009. Therefore, any allegations that relate to discrete acts occurring prior to April 19, 2008 (300 days before the date she filed her charge) were not timely made part of her charge and cannot be litigated in this lawsuit. *See Murdock v. Northrop Grumman PRB Systems*, 162 F.Supp.2d 431, 432 (D. Md. 2001) (gender-based denial of promotion claim was time-barred because the alleged denial of promotion occurred more than 300 days before the plaintiff filed his charge).  "The failure to file a complaint with the EEOC in a timely manner deprives [the court] of subject-matter jurisdiction over the claim." *Dolgaleva v. Virginia Beach City Public Schools*, 364 Fed. Appx. 820, 824 (4th Cir. 2010).

One of the plaintiff's primary complaints in this case is that the defendant applied its policies disparately because of her disability. Specifically, she contends that

9

while she was working eight-hour days and the other members of her department were working ten-hour days, she was required to take two hours of paid vacation leave concurrently with her unpaid medical leave while several other employees left work early but were not required to take vacation leave. All of the alleged instances on which her co-workers took leave occurred during February 2008 (amended comp. ¶¶ 6, 19-29). The plaintiff claims that she was told on February 1, 2008, that she was going to have to use vacation time for the two hours of the day when she could not work (amended comp. ¶ 6). However, the plaintiff's charge was not filed until February 13, 2009, approximately one year after the alleged disparate treatment and well outside of the 300-day time limit established by the ADA.

In response to the defendant's argument that this claim is time-barred, the plaintiff argues that she actually filed with the EEOC on December 19, 2008 (doc. 121 at p. 1). According to EEOC records submitted by the defendant, the plaintiff did complete an EEOC Intake Questionnaire on December 19, 2008 (doc. 125-1). At the end of the questionnaire, the form set forth the deadlines for filing a charge of job discrimination. Rather than checking the box stating "I want to file a charge of discrimination . . . ," the plaintiff checked the box that reads:

> I want to talk to an EEOC employee before deciding whether to file a charge of discrimination. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

(Doc. 125-1 at p. 5). Therefore, the relevant date in determining whether the plaintiff's allegations are untimely is February 13, 2009, the date when she filed her formal charge, and not the December 19, 2008, date when she completed her intake questionnaire. *See Lugo-Young v. Courier Network, Inc.*, No. 10-cv-3197 (RRM) (LB), 2012 WL 847381, at \*6 (E.D.N.Y. Mar. 13, 2012) (holding that plaintiff's formal charge date, rather than the date

of completion of EEOC intake questionnaire, was the relevant date for assessing timeliness where the plaintiff checked a box containing language identical to the language at issue here).

The plaintiff also states that her co-worker Tracey Gilliland told her on June 12, 2008, that "when her [sic] and her husband, Robbie Gilliland would leave for doctor visit [sic] they didn't have to use vacation time." In doing so, the plaintiff appears to argue that June 12, 2008, is the relevant date in evaluating the timeliness of her claim because on that date, a comparator (Tracey Gilliland) told her that Gilliland and her husband were not required to use vacation time when they took FMLA leave. However, as argued by the defendant, this date is meaningless in determining whether the plaintiff's charge is timely. Under the ADA, "[a] charge under this section shall be filed within [300] days after the alleged unlawful employment practice occurred . . . ." 42 U.S.C. § 2000e-5(e)(1). The relevant date for determining the timeliness of the plaintiff's claim is the date when the alleged disparate treatment occurred, rather than when the plaintiff discovered she was being treated differently. *See Hamilton v. 1st Source Bank*, 928 F.2d 86, 90 (4th Cir. 1990) (holding that statute of limitations for ADEA claim, which contains virtually identical language to 42 U.S.C. § 2000e-5(e)(1), began to run from time of alleged discriminatory act and not from time employee discovered or should have discovered that he was a victim of discrimination); *see also Cartee v. Wilbur Smith Associates, Inc.*, C.A. No. 3:09-1974-JFA-PJG, 2010 WL 1052198, at *4 (D.S.C. Feb. 3, 2010) (holding that "the precedent of this circuit compels the conclusion that the discovery rule cannot be used to assert a Title VII claim when the administrative charge was filed more than 300 days after the discrete act of termination occurred"), *adopted by* 2010 WL 1052195 (D.S.C. Mar. 22, 2010); *Keeshan v. Eau Claire Co-op. Health Centers, Inc.*, C.A. No. 3:05-3601-MBS, 2007 WL 2903962, at *4 n.2 (D.S.C. Oct. 2, 2007) (holding that for Title VII purposes, "[t]he limitations period runs from the time of the allegedly discriminatory personnel action, not from the discovery of the

alleged discrimination"). Moreover, as argued by the defendant, even if the discovery rule did apply, the plaintiff testified that she knew the defendant was treating her differently than her co-workers because her experience "back in the day" was that employees who got off work after working eight hours of a ten hour shift were not required to use vacation for the remaining two hours (pl. dep. 164-65).

Based upon the foregoing, the plaintiff's allegation that the defendant discriminated against her because of her disability because she was required to take two hours of paid vacation leave while several other employees left work early but were not required to take vacation is untimely and cannot be the basis for any recovery under the ADA.

*Disability Discrimination*

As discussed above, only two of the allegedly discriminatory acts contained in the plaintiff's EEOC charge and amended complaint are timely: the August and December 2008 layoffs. To establish a *prima facie* case in a reduction-in-force case under the ADA, the plaintiff must show:

> (1) [sh]e was an individual with a disability; (2) [s]he was selected from a larger group of candidates; (3) [s]he was performing at a level substantially equivalent to the lowest level of that in the group retained; and (4) the selection process produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing.

*Eckhardt v. Bank of America, N.A.*, No. 3:06cv512, 2008 WL 5100843, at *14 (W.D.N.C. Nov. 26, 2008) (citations omitted). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory basis for the challenged employment action. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). If the defendant proffers a nondiscriminatory reason for the employment action, the plaintiff must

then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. *Id.* at 804; *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 147 (2000).

The plaintiff alleges in her complaint that on August 4, 2008, Karen Beasley laid her off because the Service Department was moving to a ten hour shift and the company "could no longer compensate [her]" (amended comp. ¶ 13; pl. dep. 66-67). As noted above, the defendant does not have a record of the plaintiff being laid off in August 2008, and Ms. Beasley does not have a recollection of any such layoff, although the company's pay records show that the plaintiff only worked three hours during one week in August 2008. This is consistent with the plaintiff's recollection that it was "a few days" or "a week" before she was called back in to work by Ms. Beasley. The plaintiff has come forward with absolutely no evidence to suggest that the one-week layoff occurred under circumstances that would raise a reasonable inference of disability discrimination.

The plaintiff cannot establish a *prima facie* case of disability discrimination with regard to the December 2008 layoff. Assuming for purposes of this motion that the plaintiff was "disabled" at the time of her layoff, she has not shown that the reduction-in-force produced a residual work force that contained some unprotected persons who were performing at a level lower than that at which the plaintiff was performing. The plaintiff has admitted that she does not know the identity of the individuals who were retained after the reduction-in-force pursuant to which she was laid off and that she does not know whether they were more or less qualified than her:

> Q: Do you know how many people were left in the service department after December?
>
> A: No. I don't know that either.
>
> Q: Do you know whether any of the people – well, do you know who was left?

13

> A: No. I don't know that either.
>
> Q: All right. So do you know whether they were more or less qualified than you?
>
> A: No. Because I don't know who was left or who was laid off. So I wouldn't have no idea.
>
> Q: And you wouldn't know whether they were more skilled than you?
>
> A: And again, I don't know.

(Pl. dep. 149).

Further, the defendant has presented evidence that business conditions required it to reduce the size of its workforce, and the plaintiff was less skilled than the employees the company chose to retain in the Service Department. Specifically, the evidence shows that around December 2008, the defendant's largest customer, BMW, made a decision to change its work schedule with a corresponding reduction in production. Anticipating the reduction, the defendant made the decision to change its own production schedule. Around the same period of time, the company made the decision to transfer a large portion of its Service work to its facility in Norcross, Georgia. As a result of the new schedule, the reduced production requirements, and the transfer of a significant portion of Service work to the Norcross facility, it was necessary for the defendant to implement a reduction-in-force at its Duncan facility. Pursuant to this reduction-in-force, between December 17 and 20, 2008, the defendant laid off 50 employees, including the plaintiff. As part of the reduction, the first shift of the Service Department where the plaintiff worked was reduced to four employees, all of whom were selected to be retained based upon their skill

sets and adaptability to multiple positions, in Service, Logistics, and in Production. Because the company was laying off employees in Production, it needed to retain Service employees who were also trained to perform Production and/or Logistics tasks, so those employees could fill in for absent Production and/or Logistics employees. The four employees who were retained were all skilled and cross-trained in multiple processes within the facility. The retained employees were:

> 1. Chad Shuford, who was the Team Leader of the Service Department, had experience as a forklift driver, and was skilled at working a headlight assembler;
>
> 2. Darryle Young, who was experienced in running most processes in Production, including rear snapping assembly and rear welding equipment, and had prior forklift experience at another company;
>
> 3. Karen Hill, who was skilled in frontline welding, frontline snapping, and lateral panel inspection; and
>
> 4. Ervin Jackson, who was skilled in running every welder in the facility, including the arc finishing welder, and was trained to operate a forklift.

(Hunter aff. ¶¶ 3-13).

Unlike Mr. Shuford, Mr. Young, or Mr. Jackson, the plaintiff was never trained to operate a forklift, and she never served as a Team Leader like Mr. Shuford (pl. dep. 29). Unlike Mr. Young, Ms. Hill, or Mr. Jackson, the plaintiff does not have experience in welding; she testified that the type of "welding" she had performed during her time with the defendant was operating a soldering gun to join pieces of fenders that had not been fully joined (*id.* 160). Based upon the foregoing, the defendant met its burden of articulating a legitimate, nondiscriminatory reason for selecting the plaintiff for layoff.

The plaintiff has failed to present evidence that the defendant's reason for her layoff was pretext for discrimination based upon her disability. The plaintiff's employment ended approximately 17 months after she first went out on leave from work because of her lupus and four months after she was cleared to work with no restrictions. She has admitted that she does not know who made the decision to lay her off (pl. dep. 149) and that she does not have evidence to suggest that the December 2008 layoff was for any reason other than business need (*id.* 148).

Based upon the foregoing, summary judgment should be granted on the plaintiff's claims under the ADA.

*FMLA*

The plaintiff claims that she was treated unfairly with regard to the amount of paid vacation time that she was required to use in February 2008 while on FMLA leave (amended comp. ¶ 6). To the extent that the amended complaint can be interpreted as asserting a claim of retaliation under the FMLA, the plaintiff's claim is outside the statute of limitations and is therefore untimely. She filed her complaint in this action on June 10, 2011, over three years after her claim accrued. An employee must file a lawsuit "within two years after the last action which the employee contends was in violation of the [FMLA], or three years if the violation was willful." 29 C.F.R. § 825.400(b). Similarly, the plaintiff's allegation that on July 7, 2008, Rick Wallace rated her attendance as "poor" on her 2008 evaluation when she had taken FMLA leave during the prior 12 months (amended comp. ¶ 12) is outside the applicable statute of limitations unless she can show a willful violation of the statute.

> A willful violation is shown when an employer knew or showed reckless disregard regarding whether its conduct was prohibited by the FMLA. *Settle v. S.W. Rodgers Co.*, 998 F.Supp. 657, 663 (E.D.Va.1998), aff'd 182 F.3d 909 (4th Cir.1999) (unpublished table decision) (citing *McLaughlin v. Richland*

16

> *Shoe Co.*, 486 U.S. 128, 130, 135 (1988)). In other words, to prove a willful violation, a plaintiff must go beyond showing that its employer was merely negligent in determining the employer's legal obligations under the FMLA. *See McLaughlin*, 486 U.S. at 133.

*Avent v. Kraft Foods Global, Inc.*, C.A. No. 3:11-cv-37, 2012 WL 3555378, at *4 (E.D. Va. Aug. 16, 2012) (slip copy) (parallel citations omitted). The plaintiff has failed to allege a willful violation of the FMLA in her amended to complaint, nor do the factual allegations in the amended complaint support such an inference. Moreover, she has failed to set forth any evidence to support a finding that the defendant knew or showed reckless disregard for whether its conduct was prohibited by the FMLA.[5] Accordingly, her claims are barred by the two-year statute of limitations.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 101) on the plaintiff's claims be granted.[6] The plaintiff's motion to strike (doc. 122) the defendant's motion for summary judgment is meritless and is therefore denied.

November 30, 2012                                                         s/ Kevin F. McDonald
Greenville, South Carolina                                           United States Magistrate Judge

---

[5] The plaintiff does not address the defendant's statute of limitations argument in her responses in opposition to the motion for summary judgment.

[6] In its answer to the plaintiff's amended complaint, the defendant asserted counterclaims against the plaintiff for breach of contract and money had and received (*see* doc. 31). In its motion for summary judgment now before the court, the defendant argues that the plaintiff "has failed to present any material questions of fact for trial to support her claim of disability discrimination" and seeks dismissal of the case with prejudice (def. m.s.j. 30). The defendant has not moved for summary judgment on its counterclaims, and thus they are not addressed herein.

17

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 300 East Washington St, Room 239
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).